Hawkins, J.,
delivered the opinion of the Court.
The plaintiff in error, together with one Stonecypher, was indicted for the murder of one Francis. He was arraigned, tried, and by the jury found guilty of murder in the second degree. A new trial having been refused, he has appealed in error, to this Court.
Several grounds of error have been assigned in argument.
1st, It is insisted the Court erred in refusing to continue the cause, upon the affidavits filed by the defendant.
The Circuit Judge refused the application upon the ground of the insufficiency of the affidavits; and the question is: How far will this Court control the discretion of the Circuit Court in such cases?
It was held by this Court, in the case of Gray vs. The State, 10 Yerger, that the supervisory control of this Court over the legal discretion of the Circuit Court, in the application and enforcement of their rules for the conduct of causes before them, is of a very delicate character, exacting from this Court the utmost caution and circumspection, and to be exerted neither frequently nor upon slight grounds.
This doctrine was re-affirmed in the case of Goodman vs. The State, Meigs’ Rep.; and although in the latter case the Court say they were of the opinion that the *163 affidavit did contain sufficient grounds for a continuance of the cause, yet the Court said further : “If the Circuit Court had merely refused to continue the case upon the ground of the insufficiency of the affidavit, we should have hesitated long, before we would, for that reason, have reversed the judgment.”
But, say the Court, “the record manifests that the Circuit Court thought as we do., that the affidavit was sufficient, and refused to continue the case, because the Attorney-G-eneral offered to admit the absent witnesses would, if present, testify as stated in the affidavit.”
In the case of Nelson vs. The State, 2 Swan, 482, this Court said: “It has often been decided by this Court, that continuances are, and should he, left very much to the discretion of the Circuit Judge; and we now say, that it would require a very strong case of abuse of this discretion to authorize this Court to interfere.”
And in the same case, the Court also say: “Public policy, as well as individual interest, requires that justice should be administered without delay, so far as it can he done consistently with the allowance of a reasonable opportunity for that preparation which is necessary, in each particular case, for the attainment of justice. This sentiment applies to both civil and criminal cases.”
In the case of Pitts vs. Gillam, 1 Head, 549, this Court held, that “continuances are in the discretion of the Court, and we would not reverse its action upon' such motions, unless it clearly appeared that there had been a very great abuse of this discretion.”
*164 This, we regard as the settled rule of this Court. The only question for our consideration, then, is: Has there been such an abuse of this discretion in this case as will authorize this Court to interfere?
The plaintiff in error was arrested in July, 1865, soon after the finding of the indictment, and on the 31st of July, 1865, was admitted to hail. At the following October Term of the Court, he was again recognized, and, as it would seem, the case continued by consent. At the following February Term, 1866, the cause was again continued by consent, and the defendant recognized. The same was done again at the following June Term. At the following October Term, the cause was continued on the affidavit of the defendant, when he was again recognized; and at the following February Term, 1867, these applications were made for the continuance of the cause. Then nineteen months had elapsed after the arrest of the defendant, during the whole of which time he was on bail, and had full opportunity to prepare for his defense; and four months after he had continued his cause upon affidavit, partly because of the absence of his counsel, whom he had employed and paid to conduct his defense; and the reason now assigned in support of the application to continue, is, that in laying his case before his counsel, about two weeks before the date of these affidavits, the defendant was, for the first time, advised of the materiality of the testimony of certain witnesses, when it was too late to procure the benefit of their testimony at that term of the court.
Parties accused of crime, must be held to the ex *165 ercise of reasonable diligence in the preparation for their defense. Otherwise, the guilty would escape punishment; and, in this case, to say the least of it, it seems to us, the defendant has been guilty of most extraordinary laches, if, as he insinuated, he never laid his case before his counsel until two weeks before his application. But, be this as it may, we certainly are unable to see that the Circuit Court has been guilty of a great abuse of discretion; upon the other hand, we think refusal of the application was correct.
The next error assigned, is, as to the action of the Court in holding a juror incompetent, because he was not a qualified voter under the late Franchise Law. It is not now necessary to determine this question, for the record shows, that, upon his examination touching his qualification as a juror, the juror stated he was neither a freeholder or a householder in the county. He was, therefore, clearly incompetent.
The next error assigned, is, that certain statements of Stonecypher, a short time before the killing, were improperly excluded from the jury.. Upon the trial, the defendant introduced one Louisa Brummet, who stated that, a short time before the killing, Thomas Stonecypher and Mathias Garber were at “our house,” and left there, going in the direction of where Francis was killed. The witness was then asked, “whether or not Stonecypher stated, on leaving her house, in the presence of Garber, that they were going to arrest Francis, the deceased, as a deserter from the Confederate army, by virtue of orders from the Provost Marshal at Jonesborough ?” This *166 question was objected to' by the Attorney-General, and the objection was sustained by the Court.
It is insisted, the statement made by Stonecypher, under these circumstances, was competent as part of the res gestae.
Nothing is known of the circumstances immediately attending the homicide, except as they are gathered from the confessions of Stonecypher and Garber.
Abraham Fine proved, that on the day of the killing, he met Stonecypher and Garber, when Garber told him Stonecypher had killed Francis; that Francis was cutting oats in Waters’ field, was cutting from them, and they slipped along and laid still until he came back towards them. Stonecypher said to Francis, he might consider himself his prisoner, and he would have to go with him. Francis then asked Stonecypher, if he would not let him go for his jacket or round-about. Stonecy-pher gave him permission to do so; he walked a little distance, seemed excited, and made at Stonecypher, and then Stonecypher shot him. He also said Francis seemed to suffer much, and he bound a sheaf of oats and put it under his head, and the only way they could arrest him, was to take the advantage of him.
Humphreys, another witness for the State, proves: “Stonecypher and Garber came to my house the day after the killing. Stonecypher said, ‘I reckon you have heard I have killed Bill Francis.’ I said ‘No, how did you happen to do it?’ He said: ‘We found where he had been cutting' oats in Waters’ field. He cut about half way through the field, and turned; we went to the end *167 of the field, and crawled about two hundred yards on our hands and knees; we kept concealed until he cut out; we raised up, and I told him he was my prisoner. He said, ‘ I reckon not.’ I said, ‘Yes you are; and you have to do one of two things — you have to quit and go to town with me, or else I will kill you right here.’ Erancis said, ‘ I won’t do nary one.’ I said, ‘You have to do one or the other.’ Erancis. said, ‘If you come about me I will stick my scythe in you.’ I replied, ‘If you offer that, I will shoot you.’ We had a few more words, and Erancis turned round and said, ‘I must get my roundabout, anyhow, and stepped off three or four steps from where he was standing. Then I cocked my pistol. I thought he heard the click of. the lock. He then wheeled round and raised his fist in a striking attitude, and came towards us; and I knew he could whip us both in a minute or two; and when, he got in three or four steps of me, I shot him, I expect through the heart. His hand struck my boot when he fell, and he died in three or four minutes.”
There was also proof that Stonecypher and G-arber had been in the rebel army, and that Garber said he had been discharged. The proof also showed there were rebel soldiers in the country, and that there was a rebel Provost Marshal at Jonesboro,’ at that time.
Eine, on his cross-examination, proved, that, in the conversation with Stonecypher and Garber, which he had detailed in his examination in chief, they said that Erancis was subject to conscription in the Confederate army, and they were after him to arrest him, and to bring him to town to the Marshal. He also proved he was an enroll *168 ing officer, and bad enrolled Francis as a conscript, after the orders allowing details at iron works. Many other facts were proven, which we deem it wholly unnecessary to mention.
Grreenleaf on Ev., vol. 1, sec. 108, says: “There are other declarations which are admitted as original evidence, being distinguished from hearsay by their connection with the principal fact under investigation. The affairs of men consist of a complication of circumstances, so intimately interwoven as to be hardly separable from each other. Each owes its birth to some preceding circumstance, and, in its turn, becomes the prolific parent of others; and each, during its existence, has inseparable attributes, and its kindred facts, materially affecting its character, and essential to be known, in order to a right understanding of its nature. These surrounding circumstances, constituting part of the res gestee, may always be shown to the jury along with the principal fact, •and their admissibility are determined by the Judge, according to the degree of their relation to that fact, and in the exercise of his sound discretion — it being extremely difficult, if not impossible, to bring this class of cases within the limits of a more particular description.”
In the same section, the author says, further: “When a person enters into land, in order to take advantage of a forfeiture, to foreclose a mortgage, to defeat a disseiz-ure or the like, or changes his actual residence or domi-cil, or is upon a journey, or leaves his home, or returns thither, or remains abroad, or secretes himself, or, in feri, does any other act material to be understood — his declarations made at the time of the transaction, and ex *169 pressive of its character, motives or object, are regarded as ‘verbal acts,’ indicating a present purpose and intention, and are, therefore, admissible in proof like any other material facts.”
Declarations, to become part of the res gestee, must have been done at the time of the act done, which they are supposed to characterize, and have been well calculated to unfold the nature and quality of the facts they were intended to explain, and so to harmonize with them as obviously to constitute but one transaction: 3 Coner’s R., 250, p. 611; 3 Kelly, 513; Greenleaf on Ev., 4th ed., sec. 108, note 2.
In Carroll vs. The State, (3 Hum., 315,) it was held, that the declarations of the deceased, made on the day before his death, as to the object and purpose of a contemplated trip which he did take, were admissible as evidence, because it was legally contemporaneous with the main fact — the trip; and the opinion of the Court, in the case of Kirby vs. the State, is cited and relied upon as strengthening this position.
In the case of Cornwell vs. the State, (Mart. and Yer., 147,) this Court said: “It is a great mistake to suppose that the res gestee, in the legal sense, is, in a case of murder, confined to the fact of thrusting the knife into the body, and thereby depriving of life. The res gestee is the murder, and the murder is made up of the homicide and the intent with which it was committed. Actions, therefore, which seem to demonstrate the quo animo, are a part of the res gestee, and words which are a part of these actions, are admissible.”
*170 Now, the fact haying been established, that Stonecy-pher and Garber went to the field where Erancis was at work, and while there, Stonecypher shot Erancis, it then becomes material, in order to determine the quo animo with which the homicide was done, to ascertain the intention, object and purposes of Stonecypher and Garber in going to the field, or in search of the deceased; and in this view of the case, we think the proof of declarations of the parties, a very short time before the killing, while going in the direction of the place where it occurred, showing why they were going in that direction, and for what purpose they were seeking the deceased, constitutes a part of the res gestee, and were improperly excluded.
The weight and effect to be giyen to such declarations, is, however, a matter for the consideration of the jury, together with all the other facts and circumstances in the case.
Various other grounds of error have been assigned in argument; but, being satisfied the rejection of the testimony before referred to, was an error for which a new trial must be allowed, we have not deemed it necessary to pursue the investigation further.
The judgment of the Circuit Court will be reversed, a new trial awarded, and the cause remanded.